# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 76721-6-I |
| | ) | (consol. with Nos. 76722-4-I, |
| D.M.R., | ) | 76723-2-I, 76724-1-I, |
| DOB: 10/02/14, | ) | 76725-9-I, 76726-7-I) |
| | ) | |
| M.G.R., | ) | |
| DOB: 10/02/14, | ) | DIVISION ONE |
| | ) | |
| U.C.R., | ) | UNPUBLISHED OPINION |
| DOB: 11/28/13, | ) | |
| | ) | |
| | ) | FILED: March 5, 2018 |
| | ) | |

APPELWICK, J. — Carey and Goheen-Rengo appeal orders terminating their parental rights to U.R., M.R., and D.R. Carey contends the Department failed to offer or provide all necessary and available services capable of correcting her parental deficiencies. Goheen-Rengo contends the Department failed to prove that there was little likelihood his parental deficiencies could be remedied in the near future, that he was unfit to parent, and that termination was in the best interests of the children. Substantial evidence supports the relevant findings. We affirm.

## FACTS

Erica Carey and Cleve Goheen-Rengo are the parents of four children: U.R. (born 11/28/13), twins D.R. and M.R. (born 10/02/14), and J.E.C. (born

No. 76721-6-I/2

10/29/15).[1] Since the couple met in 2013, police in several cities have repeatedly responded to reports of domestic disputes at the couple's residences.

In October 2013, before U.R. was born, police in La Center, Washington, responded three times in one evening to reported disturbances. An argument between Carey and Goheen-Rengo's mother led to the mother's arrest. When Carey later attempted to dial 911, Goheen-Rengo reportedly interrupted the call, twisted Carey's wrists, and took the phone from her. Police arrested Goheen-Rengo and removed him from the home.

In March 2014, La Center police responded to another dispute at the couple's residence. Carey, who was pregnant with twins, was planning to move to Bellingham and stay with Goheen-Rengo's father, but Goheen-Rengo would not allow her to leave with U.R. After two visits from the police, Goheen-Rengo finally allowed Carey to leave with the infant.

At the time of the twins' birth on October 2, 2014, Carey, Goheen-Rengo, and U.R. were sharing a one bedroom apartment in Bellingham with Goheen-Rengo's father. The twins were born at home without medical assistance. Carey had only minimal prenatal care, and the parents did not seek any medical care after the twins were born.

On October 6, 2014, Bellingham police responded to a call from Goheen-Rengo's father about the family's welfare. Carey was "crying hysterically" and told

---

[1] J.E.C. is involved in a separate dependency proceeding and is not part of this appeal.

-2-

officers that she was struggling to care for and breastfeed the three children. The police called paramedics, who checked the children and found no immediate medical concerns.

A Department of Social and Health Services (Department) social worker met with the family and developed a protective action plan. Carey agreed to schedule a well-child appointment for the twins with a pediatrician and to arrange a medical appointment for U.R., who had a deep red rash on his legs. Carey also agreed to arrange for nutritional support services.

On October 9, 2014, Carey called the police for assistance in taking U.R. to a medical appointment for his rash. Goheen-Rengo would not allow her to leave the apartment with the children. Carey eventually arranged for transportation and took the three children to a hospital. After an examination, Carey received an antibiotic cream for U.R.'s rash and antibiotics for her urinary tract infection. Carey later informed a Department social worker that she did not plan to use the prescribed medication for herself or U.R. The physician also provided Carey with formula to supplement the children's nutrition.

Carey and Goheen-Rengo opposed the Department's recommendations regarding supplementation to breastfeeding. Although Carey made an appointment for nutrition services, she did not keep the appointment.

On November 5, 2014, citing continuing concerns about the children's medical condition, the reports of ongoing domestic disputes, and the parents' ability to provide a safe and nurturing environment, the Department filed a

dependency petition and removed the children from the parents' home. Naomi Rodriguez, the Department social worker, arranged voluntary services for the parents, including domestic violence services and parenting education through Francie Gass, a public health nurse. In January 2015, Carey informed Rodriguez that Gass had been providing "outdated information." Carey found participation in the services pointless because she "knew all she needed to know."

Dr. Rowena Pusateri, a pediatrician, examined the twins when they were about six weeks old. Dr. Pusateri diagnosed a failure to thrive, noting the twins were below the third percentile on the weight chart. The parents' expert witness, a licensed midwife, disagreed with Dr. Pusateri's analysis and maintained that the twins were not underweight.

It is undisputed that at the time of the termination trial, all three children had special needs. U.R. requires treatment for anxiety and eczema. M.R. was diagnosed with autism spectrum disorder. She also has social deficits and speech delay. D.R. experienced developmental delays as a result of esophageal reflux. He has a sensory processing disorder and a significant hearing loss.

On December 5, 2014, after a lengthy shelter care hearing, the trial court returned the children to the parents. Among other things, the court ordered both parents to obtain mental health services and a psychological evaluation with a parenting component. The court ordered Carey to participate in the Women, Infants, and Children nutrition program, and in domestic violence victim's services. Goheen-Rengo agreed to resolve his existing bench warrants and complete a

domestic violence perpetrators evaluation. Carey and Goheen-Rengo also agreed to allow a visiting nurse to monitor the children's weights.

The Department provided both parents with information on how to obtain and schedule the court ordered services. But, in the weeks following the shelter care hearing, the parents failed to schedule appointments or missed scheduled appointments. Angela Pauli, a Department social worker, scheduled most of the children's medical appointments.

A few weeks after the shelter care hearing, Carey told the children's guardian ad litem (GAL) that Goheen-Rengo had a gun and that she did not feel safe in the family home with Goheen-Rengo and his mother. After the police arrived, Carey and the children left the home and spent the night in a hotel. Carey and the children returned to the family home on the following morning.

When Carey and Goheen-Rengo failed to engage in any of the court ordered mental health or domestic violence services, the Department attempted to modify the placement. The Department asked the court to place the children with Carey, on condition that she not reside with Goheen-Rengo or his family. In the alternative, the Department asked the court to place the children in foster care. On January 6, 2015, the court denied the motion, but conditioned continued placement with the parents on their full compliance with the court ordered services.

A few weeks later, concerned about ongoing reports of domestic violence in the family, the Department filed a second motion to remove the children. But, before the court could rule on the motion, Carey and Goheen-Rengo fled with the

children to California. While in California, the children's GAL received a text message from the parents, asserting that "we are not going to be kissing you all's ass anymore, baby stealers. You CPS whores can stop trying to separate us."

The California Highway Patrol stopped the family in Santa Cruz County and arrested Carey and Goheen-Rengo. Carey head-butted and kicked the arresting officer and was later charged with resisting arrest. The Department placed the children in foster care when they returned to Washington.

On February 27, 2015, after a contested fact-finding hearing, the trial court found all three children dependent under RCW 13.34.030(6)(b) (child abused or neglected) and .030(6)(c) (no parent or guardian capable of adequately caring for the child). The court rejected the parents' denial of any history of domestic violence as not credible. The court expressly found that Carey was "the victim of recurrent domestic violence perpetrated on her by [Goheen-Rengo]" and that the children had been exposed to Goheen-Rengo's domestic violence.

The court found both Carey and Goheen-Rengo had mental health issues that affected their ability to parent, in particular their ability to remain alert to their children's needs and physical safety:

> 18. The parents both are deficient in that they have a lack of insight and poor judgment that impairs their ability to safely parent and meet the needs of their children. They remain unable, without the intervention and direction of others, to recognize threats to the safety of their child[ren].

The court ordered both parents to complete previously ordered domestic violence assessments and parenting instruction, mental health assessments, and

psychological evaluations with a parenting component, and follow recommended treatments.

Both Carey and Goheen-Rengo completed court ordered psychological evaluations with Jason Prinster, PhD, in April 2015. During his evaluation, Goheen-Rengo described himself as "a high functioning person" who had no significant problems parenting his children. He denied committing any acts of domestic violence and denied any personal responsibility for his conflicts with the courts and the Department.

Prinster found that Goheen-Rengo had no prominent emotional or psychiatric disorder. But, he expressed concern about Goheen-Rengo's antisocial personality traits, criminal history, law enforcement contacts, and his expressions of anger and hostility toward others and apparent underlying anger and aggression. Prinster also found that these concerns, as well as Goheen-Rengo's "pattern of irresponsibility," including the ongoing failure to support himself financially or find stable housing and an inability to accept personal responsibility or acknowledge any need for change, were risk factors associated with domestic violence and child abuse.

As part of the parenting assessment, Prinster observed Goheen-Rengo's visit with the children, which he characterized as "warm and attentive." But, Goheen-Rengo became obviously frustrated and upset by the end of session about some dietary restrictions for one of the children. Goheen-Rengo directed some of his frustration at the supervising social worker.

Prinster concluded that based on a number of significant risk factors, Goheen-Rengo had a "guarded" prognosis for being able to properly parent his children in the next 12 months.

During her evaluation, Carey denied any history of domestic violence in her relationship with Goheen-Rengo and disputed all of her statements to the contrary. Carey acknowledged having some difficulties in the past, but denied having any significant emotional problems or psychiatric distress. Carey reported that she had separated from Goheen-Rengo but suggested that the Department's interference had caused the separation. Carey's cognitive test results were in the normal range. During the parenting observation, Prinster found Carey's interaction with the children to be pleasant and positive.

Among other things, Carey claimed that the Department was using her children for "some type of baby formula experiment" and informed Prinster of her ability to communicate with her children through clairvoyance. Prinster found these "unusual beliefs" were not "prominent enough" to warrant a specific diagnosis, but characterized them as "kind of rigid, inflexible . . . uncommon beliefs."

Prinster found that contrary to Carey's denial, the evidence of her continued involvement in a violent relationship, as well as her acknowledged refusal to seek out medical care for her children, posed a risk to the safety of the children. Prinster concluded that Carey had a "guarded or unclear" prognosis for an ability to change behaviors within a reasonable time.

In April 2015, Carey began mental health counseling with Dr. Jayme Fergoda, a licensed clinical social worker with a doctoral degree in clinical psychology. Dr. Fergoda's treatment plan addressed a number of topics, including depression and anxiety, self-care, and follow through with medical appointments. Carey attended 8 of 14 scheduled sessions.

In September 2015, Carey left the state without notice to the Department and settled in Utah, where she gave birth to J.E.C. Carey began seeing Tracy Stevens, a mental health therapist, who diagnosed adjustment disorder with anxiety and depression.

After eventually learning that Carey was in Utah, Department social workers remained in contact with both Carey and Stevens. The Department arranged for Carey to participate in Skype visits with the children. But, the Department discontinued the visits after Carey repeatedly shouted obscenities and threats at the social workers.

Carey participated in a total of 22 sessions with Stevens. Stevens noticed that during the last few sessions, Carey seemed unable to engage fully in therapy and exhibited signs of disassociation and mania. Among other things, Carey claimed that she was Wonder Woman, that she had been various celebrities in past lives, and that Goheen-Rengo was having affairs with Department social workers.

Stevens believed that Carey's mental state deteriorated shortly after Goheen-Rengo visited Carey in Utah, over Carey's objections. Stevens planned

to recommend that Carey consider an evaluation for antipsychotic medication, but Carey ended the sessions and left Utah before Stevens could discuss the matter with her.

Carey returned to Bellingham in the summer of 2016 and resumed treatment with Dr. Fergoda. Fergoda also believed that Carey needed an assessment for antipsychotic medication, but both the Department social workers and Fergoda encountered difficulties in persuading Carey to seek the appropriate evaluation. Carey missed numerous scheduled sessions with Fergoda and eventually stopped participating altogether. Fergoda was unable to schedule any appointments with Carey after December 2016.

Goheen-Rengo participated in various services, including parenting and nutrition services with Gass. Goheen-Rengo started, but did not complete, the Incredible Years parenting program. Goheen-Rengo completed anger management and domestic violence counseling sessions with Donald Staal in July 2016.

In May 2016, after several months, Goheen-Rengo stopped attending mental health counseling sessions with Deb Sawyer, claiming that he could no longer afford the insurance co-payment. When Sawyer refused to contract with the Department for further services, the Department social worker referred Goheen-Rengo to a new mental health counselor. Goheen-Rengo did not pursue the referral for additional sessions.

The Department filed termination petitions on March 18, 2016.

In June 2016, shortly before he completed his counseling sessions with Staal, Goheen-Rengo participated in a supervised visit with his children. At the time, the Department had moved Goheen-Rengo's visits to the courthouse so that he would have to go through a metal detector.

At the conclusion of the visit, Goheen-Rengo became upset. He then placed his foot in the elevator door to prevent the supervising social workers and children from leaving. When one of the social workers began to call the police, Goheen-Rengo removed his foot and allowed the elevator door to close. Goheen-Rengo then began shouting profanities at the social workers. As a result of the outburst, Goheen-Rengo was later convicted of two counts of unlawful imprisonment.

Goheen-Rengo participated in a second psychological evaluation and parenting assessment with Dr. Prinster in July 2016. During the interview, Goheen-Rengo continued to deny having any emotional difficulties and refused to accept any responsibility for his difficulties with the Department. Goheen-Rengo informed Prinster that he had completed all recommended services.

During the parenting observation, which occurred in Prinster's office, Goheen-Rengo had difficulty monitoring and managing the three toddlers. Part way through the observation, Goheen-Rengo became increasingly frustrated while attempting to change M.R.'s diaper. At one point, he abruptly told the visit supervisor that he had seen bruises on M.R.'s legs and claimed that "my daughter

is being abused, what are you going to do about this." Without waiting for a resolution, Goheen-Rengo called 911 and reported the alleged abuse.

At this point, the visit supervisor and social worker Paull told Goheen-Rengo that the observation was over and attempted to leave with the children, who were visibly upset. Goheen-Rengo became increasingly agitated and stood outside the office door, asserting that no one was leaving until the police arrived. Goheen-Rengo left once the police arrived and did not return to finish the evaluation.

Prinster concluded that not much had changed in the year since Goheen-Rengo's first evaluation. Despite participation in services, Goheen-Rengo continued to exhibit significant anger management issues that created risks for the children. Nor had he made progress in securing stable employment and housing. Prinster believed that dialectical behavior therapy might be beneficial for Goheen-Rengo if he were motivated. But, because Goheen-Rengo "was clear that he did not feel that he . . . needed any further treatment," Prinster believed that a referral would not have been appropriate.

In October 2016, the children's GAL asked the court to appoint a GAL for Carey, because of concerns about Carey's competence. After a hearing on October 26, 2016, the court granted the motion. Stacy Ziegler, the children's GAL, testified that Carey had been evaluated at Western State Hospital and diagnosed with bipolar disorder. The evaluation recommended medication for treatment.

Prinster began a second evaluation of Carey in December 2016. But, Carey's obviously deteriorated mental state prevented her from participating in a

full evaluation or a parenting assessment. Among other things, Carey claimed that she was assisting a federal investigation into the Department's trafficking of children. She also informed Prinster that a prominent actor was the father of her youngest child and that she was currently playing music with Eric Clapton, the Red Hot Chili Peppers, and Metallica.

Prinster's primary concern was that Carey's delusional and grandiose beliefs, coupled with her rigidity in thinking, refusal to recognize any need for assistance, including medical advice, in the care of her children, and her rejection of most services, compromised her ability "to make rational informed decisions" and posed significant risks to the safety of both Carey and her children.

Prinster concluded that Carey's short term prognosis for improvement was poor. He recommended that she participate in a medication assessment for her condition, but acknowledged that she would first have to be willing to meet with a psychiatrist. Prinster testified that absent extraordinary circumstances, "we have no way of compelling" involuntary medication.

After a 12 day trial in February 2017, the trial court granted the Department's petitions and terminated both Carey's and Goheen-Rengo's parental rights to all three children. The court found that despite the provision of numerous services over the course of two years, neither parent had made any meaningful progress in correcting the identified parenting deficiencies. Both parents steadfastly refused to acknowledge any parenting deficiencies or the need for services to address those deficiencies. The court found that under the circumstances, there was little

likelihood that either parent could remedy the deficiencies in the foreseeable future.

The termination order included the following findings of fact:

[2.11(A)(6)] The mother has been afforded many opportunities to understand the need for her to engage in services; she has been notified regarding them repeatedly and they have been expressly and understandably offered or provided. In addition to the mother's active participation in the dependency contested fact-finding, and the dependency court's entry of a dispositional order which set forth the initial service requirements, the mother also was made aware of the need for services following the shelter care hearing in December 2014. The Department has provided the mother with numerous letters explaining her need for services and how to engage in them. Finally, Department social workers and the guardians ad litem have also had many conversations with the mother detailing her services. The court has also ordered the mother to engage in services, and she has signed some of the court orders acknowledging her obligations. However, the mother has adopted a belief that this court lacks authority, that a higher court will overrule this court's determinations, and that therefore, it is unnecessary to follow the court's orders. Despite the frequent communication with the mother regarding services, the mother's engagement in services has been sporadic and, to the extent she has engaged, have not resulted in any appreciable improvement in her capacity to parent the child; in fact, the mother's ability to safely and capably care for the child appears worse today than it did at the outset of the case.

. . . .

[2.11(B)(2)] Although the father adamantly denies it, he has a long history of domestic violence abuse involving the mother. There have been numerous law enforcement contacts involving domestic disputes in the family home and social workers and the previous guardian ad litem have witnessed the father interacting with the mother in a manner that strongly suggests coercive control. The mother has also reported to numerous parties, the guardians ad litem, social workers, and her service providers that at various times she has felt threatened or unsafe in the father's presence, on at least two occasions leaving the family home. . . . At trial, the father testified that Mr. Staal only aske[d] once whether the father believed he was a perpetrator of domestic violence. The father testified that he denied

it to Mr. Staal, and that Mr. Staal never asked about it again. Mr. Staal, by comparison, testified that that he could not recall if he had specifically asked the father this question, and that, despite a "mass of documents" provided by the Department, did not believe the father to be a domestic violence abuser. Therefore, Mr. Staal provided services to address the father's anger management. It is notable that, several months into treatment with Mr. Staal, the father traveled to see the mother in Utah in or about late February 2016, apparently against her wishes, and was reported by the mother to have forced his way into her room and then refused to leave. Although Mr. Staal originally recommended 30 to 50 sessions, to address anger management, he graduated the father after 30 sessions, determining that the father did not require further anger management. It is remarkable that, contemporaneous to the conclusion of services with Mr. Staal, the father, apparently unable to control his anger, trapped two social workers in a courthouse elevator. Later in the summer of 2016, the father again had an angry dispute about his children during a parent-child observation for an updated psychological evaluation where he again blocked the social workers' egress, and also broke into the mother's home through a window after she returned to Bellingham. The father was charged with two counts of unlawful imprisonment involving the social workers, for which he was convicted following a jury trial in December 2016. Whether Mr. Staal misdiagnosed the father's needs for treatment is not relevant by comparison to the father's own testimony, which demonstrates his denial regarding domestic violence and his consequent endorsement that he requires no treatment for it. To the extent he received treatment from Mr. Staal for anger management, it was not effective given his numerous angry outbursts since anger management treatment concluded, including several involving impulsive behavior that was threatening or disturbing to the peace of others. At trial, the father continued to displace the importance of recognizing the extent of his responsibility for controlling his behavior: When asked whether he has any anger management problem, he dismissed it by stating that everyone does. Further, the father's anger management issues were evident to this court during the trial, as evidenced by this court's repeated interventions with the father. The court had to interrupt his testimony several times when he began yelling at attorneys during questioning. During his testimony, he continued to engage in a belligerent and threatening manner stating, for example, "You [referring to the social workers, attorneys and others in the courtroom] should all be in a box in the desert." During his testimony, in response to questions about whether he behaved in an intimidating manner during the case and whether he'd attempted to bring knives into the courthouse, he stated "The fact that I have a

gun and tried to bring 3 knives into the courthouse makes me seem pretty scary, doesn't it?" As Dr. Prinster opined in his second psychological evaluation, it does not appear that the father is amenable to any interventions at this time. Domestic violence, if perpetrated by the father in the presence of the child, places the child at risk. This can include either physical injury or psychological or emotional injury.

[2.11(B)(3)] The father received significant parenting education through the services of a public health nurse. Parenting education began shortly after the Department became involved with the family in October 2014. The public health nurse met with the father on numerous occasions, both when the child was placed in the family home, and during and after removal. The consistent theme throughout the course of the dependency involved the father's resistance accepting feedback and advice regarding his parenting, even to the point of repeatedly ignoring recommendations regarding how to safely feed the children and engage with them in play. The father made little progress in addressing his parenting deficits which include a lack of insight into the special needs of the children. In addition to the public health nurse, the father was also referred to a separate parenting program called Incredible Years. However, he failed to participate in sufficient classes and ultimately dropped out of the program. During visits, the father continued to demonstrate his deficiencies at parenting, failing to adopt or demonstrate having learned safe feeding techniques or bringing age-appropriate toys for the child. He also was unable to maintain consistent supervision of all of the children without substantial support by other family members or visit supervisors. He regularly engaged in inappropriate conversation with or around the child about such things the child coming home, using menacing speech directed at visit supervisors, and having angry, impulsive outbursts. His last visit with the child ended when he continued to violate visit rules, and then trapped the social workers in the elevator while berating them with obscenities. It is apparent that the father has not improved even marginally his ability to safely and capably parent the child despite the ample opportunity afforded him through the parenting education he was provided.[2]

Carey and Goheen-Rengo appeal.

---

[2] For purposes of this appeal, the court's findings for each child were essentially identical.

## DISCUSSION

I.  Standard of Review

Parents have fundamental liberty and privacy interests in the care and custody of their children. In re Welfare of A.J.R., 78 Wn. App. 222, 229, 896 P.2d 1298 (1995); Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

Before terminating parental rights, Washington courts must follow a two-step process. First, the State must prove the six statutory elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence.

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. [; and]

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).

Second, if the State proves the six termination factors, the court then determines, by a preponderance of the evidence, if termination is in the child's best interests. RCW 13.34.190(1)(b); In re Welfare of A.B. 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

We necessarily defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). Our deference is particularly important in proceedings affecting the parent and child relationship because of "the trial judge's advantage in having the witnesses before him or her." In re Welfare of A.W., 182 Wn.2d 689, 711, 344 P.3d 1186 (2015).

II.   Mother's Appeal

Carey challenges the finding that the Department offered or provided all reasonably available services capable of correcting her parental deficiencies within the foreseeable future. See RCW 13.34.180(1)(d). In order to satisfy this requirement, the Department must prove it offered services specifically tailored to the individual's needs. In re Dependency of T.R., 108 Wn. App. 149, 161, 29 P.3d 1275 (2001). A protracted delay in identifying and offering necessary services where parents have not resisted or refused services may undermine a finding that the Department offered or provided all necessary services under RCW

No. 76721-6-I/19

13.34.180(1)(d). In re Dependency of T.L.G., 126 Wn. App. 181, 198-203, 108 P.3d 156 (2005).

Carey contends the Department became aware of her mental health issues early in the dependency and that no later than February 2016, a year before the termination trial, the Department knew from her Utah therapist that she was becoming increasingly delusional. She argues that the Department should have offered her referrals for a psychiatric evaluation or medication management consultation. Carey acknowledges there was evidence she would have resisted such a referral, but asserts that had the Department attempted to persuade her through people she trusted, she likely would have engaged in the services and made significant progress by the time of the termination trial. The record fails to support these arguments.

The Department initially assisted Carey in obtaining mental health counseling with Dr. Fergoda. But, Carey's participation in the sessions was inconsistent, and she left the state in September 2015. Carey eventually resumed mental health counseling in Utah with Stevens, who consulted regularly with Department social workers. When Carey became increasingly delusional, Stevens planned to refer her for medication management, but Carey returned to Washington before Stevens could discuss the plan with her.

Carey resumed sessions with Dr. Fergoda in July 2016. But, Fergoda was extremely cautious about attempting to refer Carey for psychiatric services or a medication evaluation because of Carey's trust issues. Fergoda successfully

-19-

encouraged Carey to provide a release for Dr. Prinster's second evaluation. Fergoda also persuaded Carey to try an antidepressant drug through Carey's primary care physician. But, Carey did not believe the medication was effective and eventually stopped using it. Fergoda was unable to schedule any appointments with Carey after December 21, 2016.

Social worker Rodriguez testified that simply providing Carey with a referral for a psychiatric consultation would not have been effective. Rather Rodriguez discussed the matter with Carey and encouraged her to accept the service. But, Carey refused the offer. After Dr. Prinster's second evaluation, social worker Skinner attempted to find a psychiatric services provider who would be acceptable to Carey. Skinner repeatedly asked Carey for a release so that she could arrange a referral, but Carey never responded.

According to Carey, Dr. Fergoda believed Carey would have participated in psychiatric services if the Department had referred her. But, Fergoda testified only that "[i]t is possible that she would have gone." Carey asserts that if the Department had worked through one of the people that she obviously trusted, including Fergoda, she likely would have participated. But, after December 21, 2016, Dr. Fergoda was unsuccessful in arranging for Carey to attend her own counseling sessions.

Although the Department social workers did not provide Carey with a specific referral for a psychiatric or medication consultation, it made repeated efforts to persuade Carey to accept such services. Carey rejected all these

attempts. Given the nature of Carey's mental health issues, the Department's approach and efforts were reasonable. In addition, Carey's trial testimony clearly reinforced her unwillingness to participate in possible psychiatric or medication services. "[A] parent's unwillingness or inability to make use of the services provided excuses the state from offering extra services that might have been helpful." In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988). Substantial evidence supports the finding that the Department offered or provided Carey all necessary services under RCW 13.34.180(1)(d).

III.  Father's Appeal

A. Likelihood of Reunification

On appeal, Goheen-Rengo concedes the Department established the statutory elements in RCW 13.34.180(1)(a), (b), (c), (d), and (f) by clear, cogent, and convincing evidence. He contends, however, that the Department failed to prove there was "little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." RCW 13.34.180(1)(e). Goheen-Rengo claims that he willingly participated in, and successfully completed, the court ordered services, including anger management counseling, parenting services, and psychotherapy sessions. He also points to favorable testimony about his visits with the children. He argues that the evidence was therefore insufficient to establish that his parental deficiencies would not likely be remedied in the near future. We disagree.

Gass provided parenting services to Goheen-Rengo for about one year. Her services were designed to focus Goheen-Rengo's attention on issues involving the children's safety and to develop skills for responding to the children's special needs. But, Gass found that Goheen-Rengo was only "occasionally" receptive to her assistance. She testified that at the conclusion of the services, Goheen-Rengo had not improved his ability to parent and that he needed additional services. Goheen-Rengo began the Incredible Years parenting program, but dropped out after three sessions because he felt the class was neither appropriate nor beneficial.

The Department referred Goheen-Rengo to Staal for domestic violence and anger management services. Staal did not believe the evidence of domestic violence. He therefore provided Goheen-Rengo with services for only anger management and found that Goheen-Rengo successfully completed those services after 30 sessions. But, substantial evidence supports the trial court's finding that Staal's anger management services were not successful.

As the trial court noted, Goheen-Rengo's angry outbursts and hostile behavior continued despite Staal's services. In June 2016, shortly before he completed the sessions with Staal, Goheen-Rengo became upset during a visit with his children and prevented the social workers and children from leaving. The incident resulted in Goheen-Rengo's conviction for two counts of false imprisonment. In July 2016, Goheen-Rengo's angry outbursts prevented him from completing the parenting observation during Dr. Prinster's second evaluation.

Despite Goheen-Rengo's repeated denials, substantial evidence also supports the trial court's finding that he had a lengthy history of domestic violence that required treatment. He argues that the trial court improperly relied on Carey's accounts of the alleged domestic violence because she was suffering from a severe delusional disorder. But, many of Carey's reports occurred before her condition deteriorated. Moreover, social workers and law enforcement personnel were able to corroborate significant portions of Carey's accounts.

What constitutes the near future depends on the age of the child and the circumstances of the child's placement. In re Welfare of C.B., 134 Wn. App. 942, 954, 143 P.3d 846 (2006). All three children here had special needs involving unaddressed medical and developmental issues. Despite Goheen-Rengo's lengthy participation in services, the evidence established that he made no meaningful progress in developing the parental skills and demeanor necessary to recognize and respond appropriately to the children's special needs. As Dr. Prinster noted during his second evaluation, Goheen-Rengo's continuing rigid personality traits prevented him from even recognizing his parental deficiencies and limited his ability to correct the identified deficiencies. Under the circumstances, substantial evidence supports the finding that there was little likelihood Goheen-Rengo could remedy parental deficiencies within the near future. See, e.g., In re Welfare of Hall, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983) (eight months not within near future of four year old); In re A.W., 53 Wn.

App. 22, 32, 765 P.2d 307 (1988) (one year not within near future of three year old).

Goheen-Rengo's reliance on T.L.G. is misplaced. In T.L.G., this court reversed a termination order, concluding that the State failed to establish how the parents' mental health issues related to their ability to care for their children. Id. at 205-06. Moreover, the Department failed to identify the specific parental deficiencies or provide obviously needed mental health and anger management services to the parents for over a year until they completed a psychological evaluation. Id. at 198-99. Here, unlike T.L.G., the Department clearly identified Goheen-Rengo's parental deficiencies, and he has not challenged the finding that the Department offered or provided all necessary services, capable of correcting those deficiencies within the foreseeable future.

A. Current Unfitness

Goheen-Rengo contends that the Department failed to establish that he is currently unfit to parent. He relies on testimony that he was loving and affectionate during visits with his children and on evidence challenging the pediatrician's diagnosis of the twins' failure to thrive.

To satisfy its burden of proving current unfitness, the Department must establish by clear, cogent, and convincing evidence that "parenting deficiencies prevent the parent from providing the child with 'basic nurture, health, or safety.'" In re Welfare of A.B., 181 Wn. App. 45, 61, 323 P.3d 1062 (2014) (quoting RCW 13.34.020). For the reasons set forth above, the evidence established that despite

a variety of services, Goheen-Rengo failed to make meaningful progress in rectifying parental deficiencies and in developing the skills necessary to safely parent his children. Goheen-Rengo's anger and hostility continued to disrupt his visits with the children. The inability to recognize his parental deficiencies or the need for change, coupled with the rigidity in thinking and resistance to advice or intervention from professionals, prevented Goheen-Rengo from responding to the special needs of his children and posed significant risks to their safety. Goheen-Rengo demonstrated little likelihood of improving his skills in the foreseeable future. Substantial evidence supports the court's finding of current parental unfitness.

B. Best Interests

Goheen-Rengo contends that even if the Department proved the elements of RCW 13.34.180, it failed to establish that termination was in the children's best interests. Whether termination of parental rights is in the best interest of the child is necessarily a highly fact-specific inquiry. In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

At the time of the termination trial, the children had been out of the family home for more than two years. Social worker Skinner testified that the children had unaddressed medical and developmental issues and needed stability and permanency. Both parents generally blamed the Department or service providers for these circumstances. Neither parent had been able to visit the children

regularly for many months. Nor was there any real likelihood that either parent would be able to rectify parental deficiencies in the foreseeable future.

"Where a parent has been unable to rehabilitate over a lengthy dependency period, a court is 'fully justified' in finding termination in the child's best interests rather than 'leaving [the child] in the limbo of foster care for an indefinite period'" while the parent attempts rehabilitation. T.R., 108 Wn. App. at 167 (alteration in original) (quoting A.W., 53 Wn. App. at 33). Substantial evidence supports the court's determination that termination was in the best interests of the children.

The orders terminating parental rights are affirmed.

WE CONCUR: